# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### November 7, 2024 Session

## JEREMY WAYNE LONG v. CANDICE O'BRIEN BEASLEY ET AL.

**Appeal from the Circuit Court for Cheatham County**
**No. CV-6722          David D. Wolfe, Judge**

———————————————————————

### No. M2024-00444-COA-R3-CV

———————————————————————

This is a defamation action filed by a plaintiff police officer against two defendants concerning allegedly defamatory comments the defendants posted on Facebook about the officer. The defendants, citizens of Ashland City, where the plaintiff had served as a police officer for several years, filed a petition to dismiss the defamation action pursuant to the Tennessee Public Participation Act ("TPPA"). The trial court denied the petition, determining that the officer had successfully established a *prima facie* case of defamation against each defendant and that the defendants had not met their burden to establish a valid defense. The defendants appealed the denial, arguing that the officer, a public official, had not met the heightened standard of proof necessary to establish that either of them had acted with actual malice when posting their comments to Facebook. During the pendency of this appeal, the officer attempted to nonsuit the underlying defamation lawsuit and moved to dismiss this appeal as moot. Upon review, we determine that the trial court lacked subject matter jurisdiction to grant the officer's voluntary nonsuit, and therefore we deny the motion to dismiss this appeal. We further determine, upon our *de novo* review of the record, that the trial court should have granted the defendants' TPPA petition and dismissed the defamation lawsuit, pursuant to Tennessee Code Annotated § 17-20-105(b), because the officer failed to establish, by clear and convincing evidence, that either defendant had acted with actual malice when posting the Facebook comments. Accordingly, we reverse the trial court's judgment.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Kristin Fecteau Mosher, Nashville, Tennessee, for the appellants, Candice O'Brien Beasley and Chris Beasley.

Timothy V. Potter and Jennifer Foster, Dickson, Tennessee, for the appellee, Jeremy Wayne Long.

**OPINION**

I. Factual and Procedural Background

On June 22, 2021, the plaintiff, Ashland City police officer Jeremy Wayne Long, conducted a traffic stop at a "Sonic" restaurant, the subject of which was country music singer Ryan Upchurch. As the traffic stop continued, Mr. Upchurch began to record his interaction with Officer Long as a "livestream" on his Facebook page. During the livestream, numerous individuals commented on Mr. Upchurch's Facebook page in reaction to the livestream video.[1] One such individual was Candice O'Brien Beasley, defendant in the underlying lawsuit and a resident of Ashland City, who posted the following comments during the livestream:

Long is known for planting drugs.

The same cop harassed me more than 19 times when [B.B.] and [P.B.] were little now here he is harassing them and searching vehicles claiming to smell weed each time. He broke panels and all kinds of s*** in [B.B.'s] Tahoe.

Chris Beasley, Ms. Beasley's husband, also posted a comment on Mr. Upchurch's Facebook page, stating:

I know that dirty cop well. He had to leave [Ashland City(?)Police Department] back in the day because he stalked women, and would plant drugs in peoples cars to make busts. He just got hired back and is pulling over everyone to build his quota up.

According to Officer Long, he became aware of these and other comments that had been posted to Mr. Upchurch's Facebook page when, three weeks later, a man approached him and stated: "You're that cop that is known for planting drugs and stalking women. I don't need to talk to you."

---

[1] The record contains a screen shot of the subject video that does not include a date or time stamp. The exact number of comments shown on the screen shot of the livestream is "5,282." However, it is unknown how many of these comments were posted during the livestream of the traffic stop on June 22, 2021.

In October 2021, Officer Long filed a verified complaint in the Cheatham County Circuit Court ("trial court") alleging that the Beasleys had published defamatory statements about him on Mr. Upchurch's Facebook page. Officer Long further alleged that Mr. Upchurch's Facebook page "is followed by more than 561,000 people" and that the Beasleys' statements "were meant to damage his reputation and cause him harm." In December 2021, the Beasleys filed a motion to dismiss the complaint pursuant to Tennessee Rule of Civil Procedure 12.02(6), a motion which the trial court denied.[2]

On February 22, 2023, the Beasleys filed a second motion to dismiss. The motion cited Tennessee Rule of Civil Procedure 12.02(6) and requested "attorney's fees pursuant to T.C.A. 20-12-119(c)(1)." The Beasleys filed an accompanying "Memorandum in Support of Motion to Dismiss Pursuant to T.C.A. 20-12-107" ("the Memorandum").[3] In the Memorandum, the Beasleys argued that their statements appearing on Mr. Upchurch's Facebook page were protected free speech and that Officer Long's complaint should be dismissed pursuant to the TPPA, codified at Tennessee Code Annotated §§ 20-17-101, *et seq.*, because the statements involved a public figure and a public concern.[4]

The Beasleys further argued that they had a valid defense to the defamation claims because Officer Long did "not possess good standing and reputation for good character to begin with" and "hundreds or thousands of people have also commented on social media posts" making derogatory statements about Officer Long. To support this assertion, the Beasleys attached to the Memorandum screenshots of statements that others had made on social media regarding Officer Long. They also attached an affidavit from a 911 dispatcher for Cheatham County, stating: "In 2021, after Ryan Upchurch posted his YouTube videos and statements on social media about Ashland City Police Officer Jeremy Long, I was bombarded by phone calls from citizen[s] who were upset and complaining about Jeremy Long."

On June 29, 2023, Officer Long filed a response to the motion to dismiss, arguing that it should be denied due to several procedural deficiencies.[5] Regarding the merits of the motion, Officer Long argued that the Beasleys' statements about him recounted incidents that had never occurred. Hence he asserted that the Beasleys had made

---

[2] Although the parties refer to the first motion to dismiss in their respective briefs, the motion and the order denying the motion do not appear in the appellate record.

[3] Tennessee Code Annotated § 20-12-107 addresses costs omitted in taxing bills of costs. It appears that this statute was cited in error.

[4] Officer Long concedes that he is a public figure for purposes of this appeal.

[5] The purported procedural deficiencies in the second motion to dismiss have not been raised as issues on appeal.

"knowingly false" statements about him or had at least acted with "reckless indifference to the truth." Officer Long attached to his response affidavits from several people stating that Officer Long had a good reputation in the community and that the Beasleys' statements had damaged his reputation.

The Beasleys filed a reply, advancing the position, *inter alia*, that Officer Long had failed to produce evidence that the Beasleys had acted with actual malice, a requirement for a finding of defamation against a public figure. *See Funk v. Scripps Media, Inc.*, 570 S.W.3d 205, 212-13 (Tenn. 2019); *Elsten v. Coker*, No. M2019-00034-COA-R3-CV, 2019 WL 4899759, at *3 (Tenn. Ct. App. Oct. 4, 2019). The Beasleys also filed an answer to Officer Long's complaint in which they admitted to making the alleged statements but averred that (1) Mr. Beasley's comments were made about a different police officer, not Officer Long; (2) Officer Long "did not have reputation capable of being injured" because his reputation as a police officer was already tarnished throughout the community; and (3) the Beasleys' Facebook posts were protected free speech under the TPPA.

The trial court treated the Beasleys' second motion to dismiss as a valid TPPA petition to dismiss and entered an order lifting the automatic stay of discovery on August 10, 2023.[6] As part of the limited discovery, the Beasleys were deposed on October 30, 2023.[7] In December 2023, following their depositions, the Beasleys filed a supplemental brief in further support of the motion to dismiss, arguing that their deposition testimony had produced no evidence that either of them had acted with actual malice when posting the comments about Officer Long on Facebook.

Officer Long filed a supplemental response on December 28, 2023, asserting that he had successfully alleged actual malice to establish his *prima facie* case for defamation against the Beasleys. Regarding Mr. Beasley's posted comment, Officer Long claimed that Mr. Beasley "took no action to correct his prior statement once he allegedly realized the true identity of the officer." Officer Long urged that these actions demonstrated that Mr. Beasley acted with reckless disregard for the truth of his statements appearing on Mr. Upchurch's Facebook page. Regarding Ms. Beasley's Facebook posts, Officer Long contended that she knew of the falsity of or had reckless disregard for the truth of her statements as evinced by the many corrections Ms. Beasley had made to those statements during her deposition testimony. Concerning the Beasleys' assertion that Officer Long did not "possess good standing and reputation for good character to begin with," Officer Long argued that this was not a valid defense to his defamation claim and referred again to the

---

[6] The trial court apparently conducted a hearing on these matters on July 5, 2023, but no corresponding transcript appears in the record.

[7] Upon order of this Court entered on January 30, 2025, the parties provided written transcripts of the depositions, which had previously been included in the record in the form of video recordings. References to the depositions in this Opinion are taken from those transcripts.

many affidavits stating that he had a good reputation in the community that had been damaged by the Beasleys' defamatory comments concerning him.

The trial court heard arguments respecting the TPPA petition on January 3, 2024, and entered an order on February 29, 2024, denying the petition. The trial court undertook an analysis of the burden-shifting framework of the TPPA to find that the Beasleys had "demonstrated a prima facie case that they were engaging in a protected activity under the TPPA." Shifting the burden to Officer Long to establish a *prima facie* case of defamation against the Beasleys, the trial court concluded that Officer Long had met that burden as to each of them. The trial court then found that the Beasleys had not established a valid defense against the defamation claims because Officer Long had produced affidavits attesting to his good character. Accordingly, the trial court denied the Beasleys' TPPA petition to dismiss. The Beasleys timely appealed.

After the Beasleys appealed, Officer Long submitted to this Court a motion to dismiss the appeal and attached to the motion an order signed by the trial court granting his voluntary nonsuit of the underlying action, without prejudice, pursuant to Tennessee Rule of Civil Procedure 41. In his motion to dismiss before this Court, Officer Long relies on our Supreme Court's recent decision in *Flade v. City of Shelbyville*, 699 S.W.3d 272 (Tenn. 2024) to argue that a plaintiff can voluntarily nonsuit an action before a court (whether trial or appellate) adjudicates the merits of a TPPA petition.

The Beasleys filed a response to the motion to dismiss the appeal, arguing that (1) an appeal can only be dismissed by the appellant or by an agreement of the parties; (2) Officer Long is attempting to dismiss this appeal to avoid paying court costs, attorney's fees, and possible sanctions; (3) the Beasleys have a "vested right" to an adjudication of their TPPA petition; and (4) Officer Long's counsel participated in "inappropriate *ex parte* communication with the trial court" to obtain the order of dismissal from the trial court. The Beasleys further argue that this Court's holding in *Flade* is inapposite because in *Flade*, the defendant's TPPA petition was still "pending" when the plaintiff filed for voluntary nonsuit, *see Flade*, 699 S.W.3d at 295, whereas, in the case at bar, the trial court had heard and adjudicated the Beasleys' TPPA petition, and the Beasleys had appealed the trial court's decision to this Court.

Officer Long filed a reply on October 24, 2024, asserting that the trial court retained subject matter jurisdiction of the underlying defamation case and had only lost jurisdiction over the TPPA petition. Lastly, Officer Long posits that the adjudication of the TPPA petition does not grant the Beasleys a vested right to appeal because their due process rights have not been violated.

## II. Issues Presented

The Beasleys raise the following issues on appeal, which we have restated slightly:

- 5 -

1. Whether the trial court erred by determining that Officer Long had established a *prima facie* case of defamation against Mr. Beasley by showing that Mr. Beasley had acted with actual malice when he posted a comment about Officer Long on Mr. Upchurch's Facebook page.

2. Whether the trial court erred by determining that Officer Long had established a *prima facie* case of defamation against Ms. Beasley by showing that Ms. Beasley had acted with actual malice when she posted comments about Officer Long on Mr. Upchurch's live Facebook feed.

3. Whether the trial court erred by denying the Beasleys' TPPA petition to dismiss Officer Long's complaint and by failing to award their attorney's fees pursuant to the TPPA.

## III. Standard of Review

The Beasleys request that this Court review the trial court's denial of their motion to dismiss, which the trial court treated as a petition filed pursuant to the TPPA. Inasmuch as our analysis involves general issues of statutory construction and interpretation, we adhere to the following longstanding principles:

When dealing with statutory interpretation, well-defined precepts apply. Our primary objective is to carry out legislative intent without broadening or restricting the statute beyond its intended scope. *Houghton v. Aramark Educ. Res., Inc*., 90 S.W.3d 676, 678 (Tenn. 2002). In construing legislative enactments, we presume that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing. *In re C.K.G*., 173 S.W.3d 714, 722 (Tenn. 2005). When a statute is clear, we apply the plain meaning without complicating the task. *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004). Our obligation is simply to enforce the written language. *Abels ex rel. Hunt v. Genie Indus., Inc*., 202 S.W.3d 99, 102 (Tenn. 2006). It is only when a statute is ambiguous that we may reference the broader statutory scheme, the history of the legislation, or other sources. *Parks v. Tenn. Mun. League Risk Mgmt. Pool*, 974 S.W.2d 677, 679 (Tenn. 1998). Further, the language of a statute cannot be considered in a vacuum, but "should be construed, if practicable, so that its component parts are consistent and reasonable." *Marsh v. Henderson*, 221 Tenn. 42, 424 S.W.2d 193, 196 (1968). Any interpretation of the statute that "would render one section of the act repugnant to another" should be avoided. *Tenn. Elec. Power Co. v.*

- 6 -

*City of Chattanooga*, 172 Tenn. 505, 114 S.W.2d 441, 444 (1937).  We also must presume that the General Assembly was aware of any prior enactments at the time the legislation passed.  *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995).

*In re Estate of Tanner*, 295 S.W.3d 610, 613-14 (Tenn. 2009).  "Moreover, when an issue on appeal requires statutory interpretation, we review the trial court's decision de novo with no presumption of correctness." *Nationwide Mut. Fire Ins. Co. v. Memphis Light, Gas & Water*, 578 S.W.3d 26, 30 (Tenn. Ct. App. 2018).

In the specific context of a TPPA petition, this Court has further explained our standard of review as follows:

> Whether a party established a prima facie case for purposes of a TPPA petition is a legal issue we review de novo.  *See Charles v. McQueen*, 693 S.W.3d 262, 272-73 (Tenn. 2024).  Likewise, "[i]ssues of constitutional interpretation are questions of law, which we review de novo without any presumption of correctness given to the legal conclusions of the courts below." *J.A.C. by & through Carter v. Methodist Healthcare Memphis Hosps.*, 542 S.W.3d 502, 510 (Tenn. Ct. App. 2016) (quoting *Waters v. Farr*, 291 S.W.3d 873, 882 (Tenn. 2009)).

*SmileDirectClub, Inc. v. NBCUniversal Media, LLC*, M2024-01491-COA-R3-CV, ___ S.W.3d__, 2024 WL 4233949, at *7 (Tenn. Ct. App. Sep. 19, 2024).

IV.  Voluntary Nonsuit

Before reaching the substantive issues raised by the parties, we must address Officer Long's motion to dismiss this appeal.  In the motion, Officer Long states that he has taken and been granted a voluntary nonsuit of the underlying action pursuant to Tennessee Rule of Civil Procedure 41.01.  Officer Long has attached to his motion an Order of Voluntary Dismissal, signed by the trial court and entered on October 21, 2024.[8]  Officer Long contends that his voluntary dismissal of the underlying lawsuit renders this appeal moot.

Tennessee Rule of Civil Procedure 41.01(1) provides in pertinent part:

> Subject to the provisions of Rule 23.05, Rule 23.06, or Rule 66 or any statute, and except when a motion for summary judgment made by an adverse party is pending, the plaintiff shall have the right to take a voluntary nonsuit to dismiss an action without prejudice by filing a written notice of dismissal

---

[8] The Order of Voluntary Nonsuit was signed by a different Cheatham County Circuit Court judge.

at any time before the trial of a cause and serving a copy of the notice upon all parties . . . . If a counterclaim has been pleaded by a defendant prior to the service upon the defendant of plaintiff's motion to dismiss, the defendant may elect to proceed on such counterclaim in the capacity of a plaintiff.

"A plaintiff's right to voluntary dismissal without prejudice is subject to the exceptions expressly stated in Rule 41.01(1) as well as to an implied exception which prohibits nonsuit when it would deprive the defendant of some vested right." *Lacy v. Cox*, 152 S.W.3d 480, 484 (Tenn. 2004) (citing *Anderson v. Smith*, 521 S.W.2d 787, 790 (Tenn. 1975)) (footnotes omitted).[9] Interpretation of the Tennessee Rules of Civil Procedure is a question of law that we review "de novo on appeal with no presumption of correctness." *See id.* at 483 (citing *S. Constructors, Inc. v. Loudon Cnty. Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001)).

Officer Long argues that a filed TPPA petition does not constitute one of the recognized exceptions that would "curtail [his] right to take a voluntary nonsuit" pursuant to Rule 41. Officer Long relies heavily on our Supreme Court's holding in *Flade*, 699 S.W.3d at 272. In *Flade*, a property owner had sued several defendants for what he alleged to be "disparaging remarks that were made on social media." *Id.* at 276. Two of the defendants had filed petitions to dismiss the complaint pursuant to the TPPA, and the petitions had been fully briefed and set for hearing. *Id.* However, before the trial court heard oral arguments or rendered any decision on the TPPA petitions, the property owner, Mr. Flade, had voluntarily nonsuited his complaint, and the trial court accordingly dismissed the case without prejudice. *Id.*

Despite the dismissal, two of the *Flade* defendants sought to have their TPPA petitions adjudicated, but the trial court declined to do so, determining that Mr. Flade's nonsuit had "concluded the matter." *Id.* at 277. The defendants appealed the trial court's decision declining to consider the TPPA petitions, and this Court affirmed. *Id.* (citing *Flade v. City of Shelbyville*, No. M2022-00553-COA-R3-CV, 2023 WL 2200729, at *1 (Tenn. Ct. App. Feb. 24, 2023)). The Tennessee Supreme Court affirmed, determining that "although the right to take a voluntary nonsuit is subject to certain limitations, the mere

---

[9] Regarding the excepted rules expressly delineated in Rule 41, the *Lacy* Court further explained:

Rule 41.01(1) limits the right to nonsuit, providing that it shall be taken "[s]ubject to the provisions of Rule 23.05 [requiring court approval for voluntary dismissal of class actions], Rule 23.06 [requiring court approval for voluntary dismissal of shareholder derivative actions] or Rule 66 [requiring court approval for voluntary dismissal of actions wherein a receiver has been appointed] or any statute, and except when a motion for summary judgment made by an adverse party is pending . . . ."

*Lacy*, 152 S.W.3d at 484 n.7.

filing of a TPPA petition is not among them." *Flade*, 699 S.W.3d at 277. Accordingly, the *Flade* Court determined that the trial court had "correctly declined to adjudicate the pending TPPA petitions after Mr. Flade voluntarily nonsuited his complaint." *Id.* In rendering this decision, the Court instructed

> that the right to take a voluntary nonsuit is not "subject to" the provisions of the TPPA under Rule 41.01(1), that there is no vested right to adjudication of a TPPA petition pending at the time of a voluntary nonsuit, and that a TPPA petition does not constitute a counterclaim for purposes of Rule 41.01(1).

*Flade*, 699 S.W.3d at 302.

In the instant appeal, Officer Long focuses his motion to dismiss on the second portion of the *Flade* holding, in which the *Flade* court determined that there is "no vested right to adjudication of a TPPA petition pending at the time of a voluntary nonsuit." *See id.* Officer Long asserts that just as the defendants in *Flade* did not keep a vested right to adjudication of their TPPA petitions before the trial court following the plaintiff's voluntary nonsuit, the Beasleys do not maintain a "vested right to adjudication" of their TPPA petition before this Court following Officer Long's voluntary nonsuit. However, upon review, we determine Officer Long's reliance on *Flade* to be misplaced.

As Officer Long acknowledges in his motion to dismiss this appeal, the procedural posture of *Flade* differs significantly from that of this case. In *Flade*, the defendants' TPPA petitions had not yet been "argued and submitted to the trial court for determination" at the time that Mr. Flade nonsuited his complaint. *Id.* at 292. By contrast, in the instant case, the Beasleys' TPPA petition had been fully argued, adjudicated by the trial court, and appealed to this Court before Officer Long voluntarily nonsuited his complaint. Officer Long contends that "the *Flade* Court's reasoning comfortably extends to the case at bar because it produces the same result: the [voluntary] nonsuit of the underlying claim renders the TPPA petition moot[.]" We disagree.

The *Flade* Court expressly determined that the fact that the TPPA petitions remained <u>pending</u> at the time Mr. Flade filed the nonsuit was relevant to its consideration of whether the defendants had a "vested right" to adjudication of the TPPA petitions. *See id.* at 292 ("The relevant procedural posture was simply that the Petitioners' TPPA petitions had been filed but were awaiting argument and submission to the trial court for determination. Thus, the relevant question remains whether, at the time of the Plaintiff's voluntary nonsuit, the Petitioners had a vested right to the adjudication of their <u>pending</u> TPPA petitions.") (emphasis added). Significantly, the *Flade* Court expressly declined to extend its holding beyond the specific procedural posture before it, which involved a voluntary nonsuit filed while a TPPA petition remained pending before the trial court. *See Flade*, 699 S.W.3d at 296 n.28 ("We reiterate that at the time of the voluntary nonsuit in

- 9 -

this case, the TPPA petitions had not been argued or submitted to the trial court for decision. We do not decide if the result we reach today would be the same were those circumstances different.").

Here, the Beasleys' TPPA petition is no longer pending before the trial court. Instead, the Beasleys' petition has been denied by the trial court and timely appealed to this Court in accordance with Tennessee Code Annotated § 20-17-106, the section of the TPPA governing appeals. Section 20-17-106 provides, in pertinent part, that a trial court's "order dismissing or refusing to dismiss a legal action pursuant to a petition filed under [the TPPA] is immediately appealable <u>as a matter of right</u> to the court of appeals." (Emphasis added.) The section further provides that the "Tennessee Rules of Appellate Procedure applicable to appeals as a matter of right" govern such appeals. *See id.*

Tennessee Rule of Appellate Procedure 3 is the applicable rule governing appeals "as of right" and provides that "every final judgment entered by a trial court from which an appeal lies to the Supreme Court or Court of Appeals is appealable as of right." *See* Tenn. R. App. P. 3(a). "This subdivision states the general rule that in civil actions an appeal as of right may be taken only after entry of a final judgment." *See* Tenn. R. App. P. 3(a) advisory cmt. We interpret the provision in § 20-17-106, stating that a trial court's order granting or denying a TPPA petition is "immediately appealable as of right," to mean that an order granting or denying a TPPA petition is to be treated procedurally as a "final judgment" for the purpose of determining which court maintains jurisdiction over the matter on appeal.[10] We therefore determine that to avoid injustice, it is proper to recognize in this particular instance that the Beasleys maintain a vested right to appellate review of the trial court's denial of their TPPA claim. *See Flade*, 699 S.W.3d at 292 ("We have stated generally that a vested right is one which it is proper for the state to recognize and protect and of which [an] individual could not be deprived arbitrarily without injustice.") (internal quotation marks omitted); *see, e.g., Solomon v. Solomon*, No. M2021-00958-COA-R3-CV, 2023 WL 3730597, at *3 (Tenn. Ct. App. May 31, 2023) (recognizing a defendant's "vested right of appellate review" following a trial court's grant of a new trial) (internal citations omitted).[11]

Moreover, this Court has interpreted the language of § 20-17-106 as conferring "<u>mandatory</u>" and "<u>exclusive</u> jurisdiction upon this Court to adjudicate the appeal of an order 'dismissing or refusing to dismiss a legal action pursuant to a petition filed under [the

---

[10] We note that to the extent that any provision within the TPPA could be construed to procedurally conflict with the Tennessee Rules of Appellate Procedure, the procedural rule controls. *See Pratcher v. Methodist Healthcare Memphis Hosps.*, 407 S.W.3d 727, 736 (Tenn. 2013) ("Conflicts between provisions of the Tennessee Rules of Civil Procedure and Tennessee statutes which cannot be harmonized are resolved in favor of the Rules of Civil Procedure.").

[11] We do not herein conclude that an "appeal as of right" pursuant to Rule 3 or § 20-17-106 necessarily always equates to a "vested right," but confine this determination to the instant case.

TPPA].'" *See Nandigam Neurology, PLC v. Beavers*, 639 S.W.3d 651, 666-67 (Tenn. Ct. App. 2021) (quoting Tenn. Code Ann. § 20-17-106) (emphasis added). In *Nandigam*, this Court determined that "[a]ppeals pursuant to section 20-17-106 lie in this Court whether the order is final or interlocutory[.]" *See Nandigam*, 639 S.W.3d at 667. Therefore, in addition to our determination that the Beasleys maintain a vested right to this appeal pursuant to Tennessee Rule of Appellate Procedure 3, we determine that this Court maintains mandatory and exclusive jurisdiction over the Beasleys' appeal from the trial court's denial of their TPPA petition. *See Nandigam*, 639 S.W.3d at 667.

Respecting the jurisdictional relationship between trial and appellate courts generally, this Court has explained:

> While jurisdictional lines are not always bright, several recent cases have worked out important guiding rules in this area. It should now be plain that once a party perfects an appeal from a trial court's final judgment, the trial court effectively loses its authority to act in the case without leave of the appellate court. Perfecting an appeal vests jurisdiction over the case in the appropriate appellate court. *State v. Pendergrass*, 937 S.W.2d 834, 837 (Tenn. 1996); *Suggs v. Suggs' Executors*, 1 Tenn. (1 Overt.) 2, 3 (1794); *Spann v. Abraham*, 36 S.W.3d 452, 461 (Tenn. Ct. App. 1999). An appellate court retains jurisdiction over a case until its mandate returns the case to the trial court. *Raht v. Southern Ry. Co.*, 215 Tenn. 485, 498, 387 S.W.2d 781, 787 (1965) (holding that issuance of mandate by an appellate court reinvests the trial court with jurisdiction over a case); *Hall v. Pippin*, No. M2001-00387-COA-OT-CV, 2001 WL 196978, at *3 (Tenn. Ct. App. Feb.28, 2001) (No Tenn. R. App. P. 11 application filed). These principles keep cases together during the appellate process and prevent undesirable consequences of permitting a case to be pending in more than one court at the same time. *Spence v. Allstate Ins. Co.*, 883 S.W.2d 586, 596 (Tenn. 1994).

*First Am. Tr. Co. v. Franklin-Murray Dev. Co., L.P.*, 59 S.W.3d 135, 141 (Tenn. Ct. App. 2001) (footnotes omitted). "Perfecting an appeal consists of filing a timely notice of appeal and either an appeal bond or affidavit of indigency." *Id.* at 141 n.7 (citing *Blue Cross-Blue Shield of Tenn. v. Eddins*, 516 S.W.2d 76, 77 (Tenn. 1974)).

In the case at bar, the trial court entered its order denying the Beasleys' TPPA petition on February 29, 2024. Pursuant to Tennessee Rule of Appellate Procedure 3 and Tennessee Code Annotated § 20-17-106, the Beasleys filed a timely notice of appeal "as of right" on March 25, 2024, in which they indicated that a cost bond had been filed with the trial court, thus perfecting their appeal. *See First Am.*, 59 S.W.3d at 141 n.7. Once the Beasleys perfected their appeal, the trial court effectively lost its authority "to act in the case without leave of the appellate court," and jurisdiction vested in this Court. *See id.* at 141. The trial court therefore did not have the authority to enter the order of voluntary

- 11 -

dismissal on October 21, 2024, without leave from this Court. *See id.* We reiterate that this Court's subject matter jurisdiction over this TPPA appeal is mandatory and exclusive. *See Nandigam*, 693 S.W.3d at 666-67.

Because the trial court did not maintain the authority to act in the underlying lawsuit during the pendency of this appeal without leave of this Court, *see First Am.*, 59 S.W.3d at 141, we hereby vacate the trial court's order of voluntary dismissal entered on October 21, 2024. Tennessee Rule of Civil Procedure 41.01(3) requires that a "voluntary nonsuit to dismiss an action without prejudice <u>must</u> be followed by an order of voluntary dismissal signed by the court and entered by the clerk." (Emphasis added.) Officer Long's notice of voluntary nonsuit before the trial court is therefore rendered ineffectual because the order memorializing the nonsuit—required by Rule 41.01(3)—has now been vacated. Accordingly, Officer Long's motion to dismiss this appeal as moot is denied.

## V. *Prima Facie* Case of Defamation under the TPPA

### A. The Tennessee Public Participation Act (TPPA)

We now turn to the substantive issues raised on appeal. The Beasleys argue that the trial court should have dismissed Officer Long's defamation case against them following the hearing on their TPPA petition because Officer Long failed to present a *prima facie* case of defamation against either of them and therefore failed to carry his burden under the burden-shifting framework of the TPPA. Because the TPPA is a recently enacted statute, it is important to consider its history and purpose. Concerning the purpose of the TPPA, our Supreme Court has elucidated:

> The Tennessee Public Participation Act ("TPPA") was enacted in 2019 and is Tennessee's version of an anti-SLAPP statute. Tennessee Public Participation Act, ch. 185, §§ 1-2, 2019 Tenn. Pub. Acts 455-57 (codified at Tenn. Code Ann. §§ 20-17-101 to -110 (2021)). The acronym "SLAPP" stands for strategic lawsuits against public participation. The primary aim of a SLAPP is not to prevail on the merits, but rather to chill the speech of the defendant by subjecting him or her to costly and otherwise burdensome litigation. *See* 2 Rodney A. Smolla, *Law of Defamation* § 9:107 (2d ed.), Westlaw (database updated May 2024); *Nandigam Neurology, PLC v. Beavers*, 639 S.W.3d 651, 658 (Tenn. Ct. App. 2021). Because SLAPPs threaten to interfere with the exercise of constitutionally protected rights, more than twenty states have adopted anti-SLAPP statutes to protect defendants "from the often punishing process of defending" such suits. Smolla, *supra*, § 9:107.
>
> The TPPA attempts to strike a balance between two competing interests. On the one hand, it seeks to "encourage and safeguard the

- 12 -

constitutional rights of persons to petition, to speak freely, to associate freely, and to participate in government to the fullest extent permitted by law." Tenn. Code Ann. § 20-17-102. "[A]t the same time," it also seeks to "protect the rights of persons to file meritorious lawsuits for demonstrable injury." *Id.*

Like many other anti-SLAPP statutes, the TPPA establishes a procedure for swift dismissal of non-meritorious claims. The defendant in a SLAPP suit may file a petition to dismiss the action within sixty days of service of the action or "at any later time that the court deems proper." *Id.* § 20-17-104(a)-(b).

*Charles v. McQueen*, 693 S.W.3d 262, 267 (Tenn. 2024).

The TPPA provides a burden-shifting framework for courts to determine whether the lawsuit should go forward after the TPPA petition is filed:

(a)     The petitioning party has the burden of making a prima facie case that a legal action against the petitioning party is based on, relates to, or is in response to that party's exercise of the right to free speech, right to petition, or right of association.

(b)     If the petitioning party meets this burden, the court shall dismiss the legal action unless the responding party establishes a prima facie case for each essential element of the claim in the legal action.

(c)     Notwithstanding subsection (b), the court shall dismiss the legal action if the petitioning party establishes a valid defense to the claims in the legal action.

Tenn. Code Ann. § 20-17-105 (West July 1, 2019, to current).

Concerning the procedure to be followed after a TPPA petition is filed, our Supreme Court has instructed:

The filing of a TPPA petition immediately stays discovery in the pending lawsuit until the court has ruled on the petition. *Id.* § 20-17-104(d). But "[t]he court may allow specified and limited discovery relevant to the petition upon a showing of good cause." *Id.* In ruling on a petition, a court may consider "supporting and opposing sworn affidavits stating admissible evidence" and "admissible evidence presented by the parties." *Id.* § 20-17-105(d). A court's ruling on a TPPA petition is immediately appealable. *Id.* § 20-17-106.

*McQueen*, 693 S.W.3d at 268.  To establish a *prima facie* case for any claim analyzed under the TPPA, "a party must present enough evidence to allow a jury to rule in his favor on that issue."  *See id.* at 281.

Here, the parties do not dispute that Officer Long is a public official or that the Beasleys, as the petitioning parties under the TPPA, met their burden to show that Officer Long's defamation action against them "relates to, or is in response to [the Beasleys'] exercise of the right to free speech, right to petition, or right of association."  *See* Tenn. Code Ann. § 20-17-105(a).  However, the Beasleys postulate that once the burden shifted to Officer Long to present a *prima facie* case for each essential element of his defamation claim against them pursuant to § 20-17-105(b), he was unable to do so under the heightened standard for a finding of defamation against a public official.[12]

### B.  The "Actual Malice" Standard

This Court has outlined the heightened, "actual malice" standard of proof required to establish the elements of a claim of defamation against a public official as follows:

> Generally, in a defamation action, the plaintiff must prove the defendant published a false, defamatory statement about the plaintiff with knowledge of its falsity, with reckless disregard for its truth, or with negligence in failing to ascertain its truth. *Eisenstein v. WTVF-TV, News Channel 5 Network, LLC*, 389 S.W.3d 313, 317 (Tenn. Ct. App. 2012) (quoting *Hibdon v. Grabowski*, 195 S.W.3d 48, 58 (Tenn. Ct. App. 2005)). However, the standard is different and more stringent when the plaintiff is a public figure. *Id.* This is because both the First Amendment to the United States Constitution and Article I, section 19 of the Tennessee Constitution "reflect this country's 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Lewis*[*v. NewsChannel 5 Network, L.P.*], 238 S.W.3d [270,] 288 [(Tenn. Ct. App. 2007)] (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).

> In the seminal case, *New York Times Company v. Sullivan*, the U.S. Supreme Court recognized that to compel the critic of a public official "to

---

[12] Generally, "[t]o establish a prima facie case of defamation in Tennessee, the plaintiff must establish that: 1) a party published a statement; 2) with knowledge that the statement is false and defaming to the other; or 3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569 (Tenn. 1999) (citations omitted). However, when the plaintiff is a public official, the plaintiff must prove the defendant published the statement with "actual malice."

guarantee the truth of all his factual assertions . . . on pain of libel judgments" would "lead[ ] to a comparable 'self-censorship.'" 376 U.S. at 279. The Court held that errors resulting from negligence are insufficient to recover on a defamation action brought by a public figure. *Id.* at 279-80. Instead, when the plaintiff is a public figure, he or she must prove by clear and convincing evidence that the defendant made the defamatory statements with knowledge the statements were false or with reckless disregard to their truth, a standard known as "actual malice." *Id.*; *Lewis*, 238 S.W.3d at 283. Reckless disregard to the truth means the defendant had a "high degree of awareness of . . . probable falsity." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)). In other words, reckless disregard is "the purposeful avoidance of the truth." *Id.* at 692.

*Elsten*, 2019 WL 4899759, at *3; *see Funk*, 570 S.W.3d at 212-13.

The Beasleys acknowledge that Officer Long met his burden to establish the first element of his defamation case against them: that they each published a statement on Facebook.[13] They also do not dispute that Ms. Beasley intentionally published her statements about Officer Long. However, the Beasleys contend that Officer Long failed to establish that they posted the statements with "actual malice," that is, with knowledge that the statements were false or with reckless disregard for their truth. *See Elsten*, 2019 WL 4899759, at *3. As our Supreme Court has clarified regarding the "actual malice" standard:

The evidence must indicate that the defendant "entertained serious doubts" about the truth of her publication. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968)). A speaker's failure to thoroughly investigate a claim, without more, does not establish actual malice. *Trigg v. Lakeway Publishers, Inc.*, 720 S.W.2d 69, 74-75 (Tenn. Ct. App. 1986). But evidence the speaker purposefully avoided learning whether her allegations were true is evidence of actual malice. *Harte-Hanks*, 491 U.S. at 692, 109 S. Ct. 2678. Actual malice can also be established by showing that the statement was "so inherently improbable that only a reckless [individual] would have put [it] in circulation." *St. Amant*, 390 U.S. at 732, 88 S. Ct. 1323.

*McQueen*, 693 S.W.3d at 281. "Likewise, recklessness may be found where there are

---

[13] "Publication" is a term of art meaning the communication of defamatory matter to a third person. *Quality Auto Parts Co. v. Bluff City Buick Co.*, 876 S.W.2d 818, 821 (Tenn. 1994).

obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant v. Thompson*, 88 S. Ct. 1323, 1326 (1968).

"Unlike the other elements of a public-figure defamation claim, 'actual malice' must be proved by clear and convincing evidence." *SmileDirectClub, Inc.*, 2024 WL 4233949, at *11 (citing *McQueen*, 693 S.W.3d at 280). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Id.* (quoting *McQueen*, 693 S.W.3d at 281-82). The requirement to establish clear and convincing evidence "is a demanding burden. The evidence must produce a firm belief or conviction in the fact finder's mind about the truth of the facts to be established." *See McQueen*, 693 S.W. 3d at 282 (citations and quotation marks omitted). Appellate review of the trial court's finding of actual malice is *de novo*. *See id.* at 273 (citing *Tomlinson v. Kelley*, 969 S.W.2d 402, 405 (Tenn. Ct. App. 1997).

The Beasleys contend that the trial court erred generally by failing to state, or apply, the correct burden of proof required to establish a *prima facie* case of defamation against a public official. In the final order, the trial court delineated the elements for a claim of defamation as found in *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999). The trial court then briefly reviewed the proof concerning the statements made by Mr. and Ms. Beasley and concluded: "Reviewing all of the evidence produced by the parties, the Court finds that [Officer Long] has presented a prima facie case of defamation as set forth in *Sullivan v. Baptist Mem'l Hosp.*" By citing to *Sullivan*, the trial court acknowledged the standard for establishing a *prima facie* case of defamation in Tennessee, *see Sullivan*, 995 S.W.2d at 571, but erred in failing to specifically state the heightened standard required for a public official to prevail on a claim of defamation. *See Funk*, 570 S.W.3d at 212-13; *Elsten*, 2019 WL 4899759, at *3. The trial court also failed to state that the actual malice elements for a defamation claim must be established by "clear and convincing evidence." *See McQueen*, 693 S.W.3d at 280; *SmileDirectClub*, 2024 WL 4233949, at *11; *Elsten*, 2019 WL 4899759, at *2.

Officer Long, on the other hand, asserts that the standard of proof necessary to establish actual malice under the TPPA is "slightly different" from the traditional "clear and convincing" standard required to establish actual malice in other contexts, such as a motion for summary judgment. He argues that under the TPPA burden-shifting framework, a court need only "keep in mind" the "clear and convincing" standard of proof in determining whether a rational jury could find in the party's favor on the issue. Respectfully, we disagree.

Officer Long relies on the phrase, "keep in mind," which he has extracted from *McQueen*, 693 S.W.3d at 281, to urge that the standard for a finding of actual malice is in some respect different when the defendant moves to dismiss under the TPPA. To understand the standard as elucidated by our Supreme Court in *McQueen*, it is necessary to review the statement in context, as follows:

- 16 -

To establish a "prima facie" case under the TPPA, a party must present enough evidence to allow the jury to rule in his favor on that issue. This evidence may include "sworn affidavits stating admissible evidence" and "other admissible evidence." Tenn. Code Ann. § 20-17-105(d). As is the case when a court rules on a motion for summary judgment or motion for directed verdict, the court should view the evidence in the light most favorable to the party seeking to establish the prima facie case and disregard countervailing evidence. *See, e.g., Griffis v. Davidson Cnty. Metro. Gov't*, 164 S.W.3d 267, 284 (Tenn. 2005) (summary judgment); *Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995) (directed verdict).

In determining whether a rational jury could find in the party's favor on that issue, the court also must keep in mind the applicable standard of proof. Here, a jury could find in favor of Charles on the actual malice element of his defamation and false light claims only if it were to conclude that Charles had established that element by clear and convincing evidence. *Cf. Sanford v. Waugh & Co.*, 328 S.W.3d 836, 848 (Tenn. 2010) (explaining that, because punitive damages require proof by clear and convincing evidence, in reviewing a motion for directed verdict on punitive damages, "a court must determine whether there is sufficient evidence, using the clear and convincing evidence standard, to submit the punitive damage claim to the jury" (quoting *Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 207 (Tenn. Ct. App. 2008))).

*McQueen*, 693 S.W.3d at 281 (emphasis added). The *McQueen* Court proceeded to determine that "a jury would be unable to find, by clear and convincing evidence, that the defendant, McQueen, had made her statement with actual malice." *Id.* at 283 (emphasis added).

We find no reason to interpret *McQueen* as setting forth a separate and distinct standard of evidentiary proof necessary for a finding of actual malice in the context of a TPPA petition. Indeed, in *SmileDirectClub*, which was an appeal involving a TPPA action, this Court interpreted *McQueen* as providing that "[u]nlike the other elements of a public-figure defamation claim, 'actual malice' must be proved by clear and convincing evidence." *See SmileDirectClub*, 2024 WL 4233959, at *11 (citing *McQueen*, 693 S.W.3d at 280-81 and determining that the plaintiff "had to provide evidence from which a rational jury could conclude that [it had] established actual malice 'by clear and convincing evidence.'").

Therefore, to avoid dismissal of his claims under the TPPA, Officer Long was required to establish his *prima facie* defamation claim by providing clear and convincing

evidence that the Beasleys had acted with actual malice when posting the comments about him on Facebook. *See id.* Accordingly, the trial court should have applied the "clear and convincing" standard to the actual malice inquiry, and we will apply that standard in our *de novo* review on appeal.[14]

The evidence in the instant case includes recorded video and written transcripts of depositions of Mr. and Ms. Beasley, screenshots of comments made by the Beasleys and other citizens about Officer Long on some of Mr. Upchurch's social media pages, screenshots of excerpts from the Ashland City Police Department Facebook page with comments from the public, Officer Long's answer to the Beasleys' first set of interrogatories, statements and affidavits of various individuals attesting to Officer Long's good reputation in the Ashland City community, unsworn statements of Mr. and Ms. Beasley, and copies of subpoenas for production of records served by Officer Long upon the Cheatham County Sheriff's Office and the Ashland City Police Department.[15]

We now analyze the statements of each of the Beasleys to determine whether they were made with actual malice.

### 1. Mr. Beasley's Statements

As noted above, Mr. Beasley published the following statement on Mr. Upchurch's Facebook live feed:

> I know that dirty cop well. He had to leave [Ashland City Police Department] back in the day because he stalked women, and would plant drugs in peoples cars to make busts. He just got hired back and is pulling over everyone to build his quota up.

The Beasleys argue that although this statement "standing alone or uncontroverted is certainly defaming," Officer Long failed to prove that the statement was "about him" or that Mr. Beasley made the statement with the intention of stating a falsehood or with reckless disregard for its truth. The Beasleys contend that throughout the proceedings before the trial court, Mr. Beasley "consistently maintained that he mistook [Officer Long] for someone else when he made the post on social media." Specifically, the Beasleys aver that Mr. Beasley mistook Officer Long, as he appeared in Mr. Upchurch's video, for

---

[14] Upon discerning that the trial court erred in failing to fully state the correct standard of review, one option would be to remand to the trial court to apply the correct standard. However, because our review of the trial court's order is *de novo*, *see SmileDirectClub*, 2024 WL 423949, at \*7, and because the Tennessee legislature enacted the TPPA in part to mitigate the chilling of free speech through "the threat of costly, time consuming, and expensive litigation," *see Nandigam*, 639 S.W.3d at 665, we elect to resolve the matter "at the appellate level." *See id.*

[15] The documents produced in response to the subpoenas do not appear in the appellate record.

another officer who looks "very similar" to Officer Long. They further aver that Mr. Beasley was viewing Mr. Upchurch's live feed "on his phone when it was about halfway through" and that Mr. Beasley has "astigmatism and wears contacts and could not see very well on his little phone screen." They assert that because Mr. Beasley has poor eyesight and was viewing the video on a small phone screen, he mistook Officer Long in Mr. Upchurch's live video for the other officer and wrote the above comment relative to that other officer.

In the final order, the trial court found that Officer Long had met his burden to establish a *prima facie* case of defamation against Mr. Beasley. *See* Tenn. Code Ann. § 20-17-105(b). The trial court stated as follows:

> Defendant Chris Beasley posted comments that referred to [Officer Long] as a "dirty cop" who had to leave the police department because he stalked women, and would plant drugs in people's cars to make busts. He further stated [Officer Long] was just hired back and was pulling everyone over to build his quota up. [Officer Long] produce[d] proof in the form of Defendant Chris Beasley's deposition testimony that he claimed to have mistaken [Officer Long] for a different officer, and did not intend the statements to refer to [Officer Long].

The trial court did not include any factual findings from the record that would support a finding that Mr. Beasley acted with actual malice in making the statement on Mr. Upchurch's Facebook page. Instead, the trial court referred only to the proof that Mr. Beasley believed Officer Long was a different police officer and meant his written comments to refer to that officer. However, this evidence appears to undermine, rather than support, a finding that Mr. Beasley wrote his comment with actual malice. Furthermore, based upon our independent review of the record, we find no evidence to suggest that Mr. Beasley either knew that his comment was false or entertained serious doubts about its truth at the time he made it. *See McQueen*, 693 S.W.3d at 281; *St. Amant*, 88 S. Ct. at 1326.

Officer Long propounds that there is good reason to doubt Mr. Beasley's sincerity in claiming that he thought Officer Long was another officer because Mr. Beasley "took no action to correct his prior statement once he allegedly realized the true identity of the officer." However, Officer Long cites no authority—and we can find none—to support his contention that a speaker who later learns that his alleged defamatory statement was false is required to rescind the statement to avoid liability for defamation. Rather, the standard for a finding of "actual malice" is a "subjective one." *See Harte-Hanks*, 491 U.S. at 688 (stating that to find actual malice "there must be sufficient evidence to permit the

conclusion that the defendant actually had a 'high degree of awareness of . . . probable falsity.'" (quoting *Garrison v. Louisiana*, 379 U.S.. 64, 74 (1964))).[16]

Officer Long next contends that Mr. Beasley admitted in deposition that once he learned that the officer on Mr. Upchurch's Facebook page was indeed Officer Long, he made "a subsequent comment which did in fact refer" to Officer Long.  This subsequent post was as follows:

> [Officer Long] stays riding by your place and ours.  He pulled [P.B.] over in our driveway to search his car because he has tinted windows, [Officer Long] had a slight panic attack when [Ms. Beasley] and I came out because he figured out he was our son.

During Mr. Beasley's deposition, Officer Long's attorney read the above statement to Mr. Beasley and the following exchange ensued:

| Attorney: | Did you make that post? |
|---|---|
| Mr. Beasley: | Yes, I did. |
| Attorney: | You are referring to Jeremy Long there? |
| Mr. Beasley: | I am referring to Jeremy Long in that one.  I had went back and watched the video, and I had seen the very beginning when he came up and said, I'm Officer Jeremy Long with Ashland City Police Department.  So then I knew it was Jeremy Long.  Before, I did not know. |

As Officer Long correctly states, Mr. Beasley admitted in deposition that he knowingly published this subsequent statement on Mr. Upchurch's page about Officer Long.  However, there is nothing in the deposition testimony or elsewhere in the record that demonstrates that Mr. Beasley believed this statement to be false or that he had reckless disregard for its truth.  On the contrary, Mr. Beasley stated in his unsworn statement that Officer Long had once pulled over his son, P.B., "claiming his window tint was too dark."  This supports a conclusion that Mr. Beasley believed his second Facebook post to be true.

Upon careful review, we find nothing in the record to support a finding that Mr. Beasley communicated the two statements on Mr. Upchurch's Facebook page with actual

---

[16] For this reason, we also reject Officer Long's argument that the "appropriate question" for determining whether a statement is defamatory is "whether a reasonable third-party recipient of the defamatory communication would understand it to refer to the [defamation lawsuit] plaintiff."

malice. Therefore, Officer Long has failed to demonstrate with clear and convincing evidence that Mr. Beasley posted the statements at issue with knowledge of the statements' falsehood or reckless disregard for their truth. *See Elsten*, 2019 WL 4899759, at *3. Accordingly, Officer Long did not meet his burden to present a *prima facie* case of defamation against Mr. Beasley. Ergo, pursuant to the plain language of the TPPA, Officer Long's defamation claim against Mr. Beasley must be dismissed. *See* Tenn. Code Ann. § 20-17-105(b).

### 2. Ms. Beasley's Statements

Officer Long alleges that Ms. Beasley defamed him when she posted the following comments on Mr. Upchurch's Facebook page about him:

> Long is known for planting drugs.
>
> The same cop harassed me more than 19 times when [B.B.] and [P.B.] were little now here he is harassing them and searching vehicles claiming to smell weed each time. He broke panels and all kinds of s*** in [B.B.'s] Tahoe.

Regarding these statements, the trial court determined:

> [Officer Long] produced proof that Defendant Candice Beasley made the statement that [Officer Long] had harassed her more than 19 times when her sons were little, and was now harassing her sons, claiming to smell weed, and had broken parts of her son [B.B.'s] Tahoe. She also stated that [Officer Long] was known for planting drugs. [Officer Long] produced proof in the form of [Ms. Beasley's] deposition to show that those statements were false, exaggerated, and/or made with reckless disregard for the truth.

The Beasleys do not dispute that Ms. Beasley intentionally published the statements regarding Officer Long on Mr. Upchurch's Facebook page, thus satisfying the first element of Officer Long's *prima facie* case of defamation against her. However, they contend that the trial court erred by finding that Officer Long had successfully established the remaining elements of his *prima facie* case relative to these statements because "there was no clear and convincing evidence that [Ms. Beasley] acted with actual malice." Officer Long responds that Ms. Beasley's comments about him were largely "incorrect" or "exaggerated" such that a reasonable jury could conclude that Ms. Beasley had a "high degree of awareness of their probable falsity" if not actual knowledge that they were false. Officer Long points to Ms. Beasley's deposition testimony, in which she "made several corrections" to the statements posted online, as proof that she knew the statements were false or probably false.

- 21 -

Regarding Ms. Beasley's first posted comment, "Long is known for planting drugs," Officer Long argues that this statement is defamatory because Ms. Beasley "admitted that the only bases for this statement were i) her suspicion that [Officer Long] once planted drugs on her and ii) 'other rumors through town' of similar instances." Officer Long cites to the many included affidavits stating that he held a good reputation in the community as a police officer prior to the Beasleys' defamatory statements.

During her deposition, Ms. Beasley was questioned about the above statement, and the relevant portions of the exchange that ensued are as follows:

Attorney: Tell the Court everything you know about Mr. Long being known for planting drugs.

Ms. Beasley: I believe he planted drugs on me.

Attorney: Okay. All right. Who else do you know he planted drugs on?

Ms. Beasley: Just heard through other rumors . . . through town.

Attorney: Tell me everything that happened when he planted drugs on you. When did it happen?

Ms. Beasley: It happened when I lived on West Lenox Street. Do you want me to just tell you the whole situation[?]

Attorney: Yes, I do . . . Do you know when it happened? Start there.

Ms. Beasley: I don't know the year. But I lived there for, like, four years, so. I don't know the year, sir. But this was after he had pulled me over numerous times over the claim that my license was suspended ordeal. . . . So I'm going down Vine Street, which is, like, a road connecting to the road that I had lived on at that point in time, and [Officer Long] comes behind me, and I'm in my van, and my son has autism. . . . [H]e was terrified. And I— I was terrified, honestly, at that point. So I kept going. I didn't stop on Vine Street. I went another block and a half and went—took a right onto West Lenox and pulled directly into my driveway. . . . Chris Beasley came out with a cordless phone in his hand, and I just looked at him again. I said, call 9-1-1. Ask for other officers to

come out. You know, so he called 9-1-1. Chris and [Officer Long] had words. [Officer Long] handcuffed me, put me down on the hood of his car . . . [Officer Long] walks over to my van. Opens my door, reaches in, and immediately comes back up with a pill bottle in his hand. Immediately. He sets it on the roof of my van. And I—my soul sank when he done that because I know for a fact one hundred percent it was not mine. I had no clue where it came from. The only person I can come to the conclusion that it came from would be him. I didn't have friends. I didn't hang out with people. [I] was at—an at-home mom. I raised kids. I was having major health problems then. I didn't go anywhere. I didn't do anything. I wasn't around anyone. And the only conclusion that I can draw is that he placed that in my car, and I believe he did it because he thought the gig was up pulling me over saying my license was suspended and hauling me to jail over that to try to punish me for whatever reason in his mind that he was doing it for.

Ms. Beasley further stated she had been charged with "possession of narcotics" as a result of that traffic stop but that the charge had been later dismissed. She described the pill bottle as resembling a "prescription bottle with no label on it" and stated that the bottle had been "fingerprinted" but that her fingerprints had not been found on the bottle. She was further questioned as follows:

| Attorney: | Okay. And your testimony is that he planted drugs on you that day? |
|---|---|
| Ms. Beasley: | I believe that he did. . . . I believe there's no one else that could have. |
| Attorney: | Is that what you're referring to in this Facebook post, Long is known for planting drugs? |
| Ms. Beasley: | Yes, sir. And every officer knew about that. . . . On the police force, they knew all this stuff. They knew everything that was going on. . . . Everyone knew and believed that back then, that [Officer Long had] done that to me. |

- 23 -

Mr. Beasley also testified about the traffic stop during which Officer Long had arrested Ms. Beasley for possession of narcotics. Mr. Beasley related that although he could not be certain, he believed that Officer Long "possibly" put the pills in Ms. Beasley's car. Mr. Beasley did not testify concerning Ms. Beasley's belief regarding the statement, "Long is known for planting drugs."

In the context of a TPPA burden-shifting analysis, courts are constrained to "view the evidence in the light most favorable to the party seeking to establish the prima facie case and disregard countervailing evidence." *McQueen*, 693 S.W.3d at 281; *SmileDirectClub*, 2024 WL 4233949, at *9. Thus, we are mindful that we must view the evidence concerning Ms. Beasley's comments in the light most favorable to Officer Long. However, the sole evidence before us concerning Ms. Beasley's belief as to the truth of her alleged defamatory statement, "Long is known for planting drugs," is Ms. Beasley's deposition testimony and the Beasleys' unsworn statements. Officer Long did not provide any statement or other evidence recounting his version of the traffic stop involving Ms. Beasley and the pill bottle.

In her deposition, Ms. Beasley stated that she thought Officer Long had planted a pill bottle in her car during the traffic stop. She further articulated that at the time the incident occurred, she believed other officers knew that this had happened yet said nothing. In their unsworn statements, Mr. and Ms. Beasley each stated that they believed Officer Long had planted the pill bottle in Ms. Beasley's car. This scant evidence, even when viewed in the light most favorable to Officer Long, is not sufficient to establish the falsity of Ms. Beasley's version of events or that Ms. Beasley believed her version to be false. Accordingly, Officer Long has not provided clear and convincing evidence to establish that Ms. Beasley acted with actual malice when posting the statement, "Long is known for planting drugs."

We recognize that Officer Long has presented affidavits from numerous individuals stating that he maintained a good reputation as a police officer and citizen in the Ashland City community, and we do not doubt or dismiss their veracity. However, the affidavits do not alter our analysis regarding Ms. Beasley's subjective belief in the truth of her own statement. *See Harte-Hanks*, 491 U.S. at 688. Moreover, the evidence is also insufficient to permit the conclusion that Ms. Beasley "entertained serious doubts as to the truth" of her statement. *See id.* (quoting *St. Amant*, 390 U.S. at 731). For these reasons, and viewing the evidence in the light most favorable to Officer Long, we must conclude that Officer Long has failed to present clear and convincing evidence that Ms. Beasley posted the Facebook comment, "Long is known for planting drugs," with knowledge that the statement was false or with reckless disregard for its truth. Accordingly, Officer Long has failed to establish a *prima facie* case of defamation against Ms. Beasley relative to the statement, "Long is known for planting drugs."

Officer Long next contends that Ms. Beasley defamed him when she posted the following comment about him, also on Mr. Upchurch's Facebook page:

> The same cop harassed me more than 19 times when [B.B.] and [P.B.] were little now here he is harassing them and searching vehicles claiming to smell weed each time. He broke panels and all kinds of s*** in [B.B.'s] Tahoe.

As with the previous statement, the parties agree that Ms. Beasley published this statement about Officer Long, thus satisfying the first prong of Officer Long's *prima facie* case of defamation against her. However, the Beasleys contend that the trial court erred in determining that Officer Long established that Ms. Beasley had posted this statement with actual malice. Officer Long counters that Ms. Beasley knew the statement contained "many factual errors," as evinced by her subsequent correction of certain facts contained within it.

We will analyze the statement in separate clauses. The first clause in the larger statement is as follows:

> The same cop harassed me more than 19 times when [B.B.] and [P.B.] were little.

Officer Long claims that Ms. Beasley's contention that he harassed her nineteen times "is undoubtedly exaggerated." He further asserts that Ms. Beasley "admitted to driving with a suspended driver's license," a fact which, according to Officer Long, presented a legitimate reason for officers to stop Ms. Beasley multiple times when she was driving. Officer Long posits that for these reasons it is "very likely" that Ms. Beasley "entertained serious doubts regarding the truth of her allegations."

However, as Officer Long acknowledges in his appellate brief, Ms. Beasley clarified during her deposition testimony that her statement that Officer Long had "harassed" her "more than 19 times" was not limited to traffic stop encounters between herself and Officer Long but instead included many encounters that had transpired between Ms. Beasley and Officer Long over the seventeen years that she had known him. During her deposition, Ms. Beasley was questioned by Officer Long's counsel concerning the statement as follows:

> Attorney: Did Mr. Long stop you more than 19 times?
>
> Ms. Beasley: I didn't say he stopped me more than 19 times. I said I—he harassed me, like, 19 times. And when I say 19 times, I mean, like, I believe we've had at least 19 encounters with one another, even when he worked at

- 25 -

| | |
|---|---|
| | Walmart, outside of there, him contacting me, things of that nature. |
| Attorney: | Okay. So your testimony is, that he's harassed you outside of stopping you at traffic stops? |
| Ms. Beasley: | Yes, sir. |
| Attorney: | Okay. Tell me how he harassed you outside of stopping you at traffic stops. |
| Ms. Beasley: | By contacting me on my cell phone, by making comments that he's made. He made a comment before that he thought I was his—his type, but obviously, I like men that beat on me. |
| Attorney: | Stop there. Did he say that to you verbally? |
| Ms. Beasley: | Yes, sir. |
| Attorney: | Where were you at when he said that to you? |
| Ms. Beasley: | We were at Walmart. |

In addition to the above testimony, Ms. Beasley included in her unsworn statement that she had known Officer Long for "about 17 years"; that he had "texted, and said, inappropriate things" to her; and that he had personally pulled her over "numerous times on false charges." Mr. Beasley's testimony corroborated Ms. Beasley's statements that Officer Long had worked at Walmart prior to becoming an officer with the Ashland City Police Department.

Upon thorough review of the evidence, and considering it in the light most favorable to Officer Long, *see McQueen*, 693 S.W.3d at 281; *SmileDirectClub*, 2024 WL 4233949, at *9, we determine that there is insufficient proof to establish, by clear and convincing evidence, that Ms. Beasley believed this statement to be false or that she posted the statement with reckless disregard for its truth. Ms. Beasley described a seventeen-year acquaintance with Officer Long, which included several encounters between herself and Officer Long in various locations and through phone calls and text messages. Nothing in the record presents a different version of events beyond Ms. Beasley's narrative. Moreover, there is no evidence that Ms. Beasley exhibited any doubts as to her belief that she had had "at least 19 encounters" with Officer Long during which she believed he had "harassed" her. Accordingly, we determine that Officer Long has failed to establish, by clear and convincing evidence, that Ms. Beasley acted with actual malice when she made

the statement, "the same cop harassed me more than 19 times when [B.B.] and [P.B.] were little."

The next clause in Ms. Beasley's Facebook post is as follows:

[N]ow here he [Officer Long] is harassing them [P.B. and B.B.] and searching vehicles claiming to smell weed each time.

Officer Long contends that Ms. Beasley "exaggerated" this statement, and that she also "admitted that [P.B.] had marijuana on him." When asked during her deposition about this portion of her post, the following exchange ensued between Ms. Beasley and Officer Long's attorney:

| | |
|---|---|
| Attorney: | Has [Officer Long] had a traffic stop with your son [B.B.]? |
| Ms. Beasley: | I don't believe so. I—it's—like I said, I misspoke here and meant to say [P.B.'s] Escalade. . . . It was . . . all back-to-back, this was all, like, a series of events that happened within a few weeks of each other when [B.B.] got pulled over. [Officer Long] pulled over [P.B.] twice, and then the stuff with [Mr. Upchurch], and all this stuff, and it was just like—it was ridiculous. I mean, sir, you can clearly look at the photo and see that there's no tint on those windows at all. Like, that's— that's why I say, it's bulls***. That's why I used that word. That's why I say this is, you know, harassment, because when you pull someone over that doesn't have window tint on their vehicle and their reason for the stop is—is their window tint is too dark, then that's harassing someone, in my opinion. Like, I think that's a BS stop. I don't think that's—that's okay. |
| Attorney: | How many times had he stopped [P.B.], to your knowledge? |
| Ms. Beasley: | Twice. |
| Attorney: | Okay. Each time he stopped [P.B.], was [P.B.] cited for something? |
| Ms. Beasley: | One time he was. |

- 27 -

Attorney:             Okay.  And one time he was not?

Ms. Beasley:          Yes, sir.

Attorney:             Okay.  So, [P.B.] was cited once.  What was he cited
                      for?

Ms. Beasley:          He had marijuana on him.

From this testimony, it appears that Ms. Beasley believed that her son, P.B., had been pulled over for two traffic stops by Officer Long shortly before she posted the comment about Officer Long on Mr. Upchurch's Facebook page and that P.B. had marijuana with him during one of those stops.  Ms. Beasley explained that she used the word, "harassed," to describe Officer Long's behavior because she believed Officer Long had pulled over P.B. for having window tint that was too dark, when, according to Ms. Beasley, the vehicle did not have tinted windows.  Regarding Ms. Beasley's statement that Officer Long had claimed to "smell weed each time," there was no testimony or other evidence in the record to indicate whether Ms. Beasley believed the statement to be true or false.  Therefore, concerning the portions of the Facebook post wherein Ms. Beasley expressed her belief that Officer Long had harassed P.B., had "searched vehicles," and had claimed "to smell weed each time," the evidence is insufficient to establish that Ms. Beasley posted those portions of the statement knowing them to be false or with reckless disregard for their truth.

However, Ms. Beasley's testimony is conflicting regarding Officer Long's purported encounters with her other son, B.B.  According to Ms. Beasley's deposition testimony above, B.B. had also been pulled over close to the time that Ms. Beasley posted on Mr. Upchurch's Facebook page.  Ms. Beasley later clarified that it was "two officers" who had pulled over B.B., and not Officer Long.  Ms. Beasley stated that she did not believe Officer Long had conducted a traffic stop involving B.B.  However, Ms. Beasley's unsworn statement contradicts her deposition testimony in this regard.  In her unsworn statement, Ms. Beasley wrote that Officer Long had "pulled over my sons, now that they are of driving age," indicating a belief that Officer Long had pulled each son over at least once.  Thus, examining the portion of Ms. Beasley's Facebook post, "now here he is harassing them,"— inasmuch as the post is meant to include Ms. Beasley's son, B.B, and considering the evidence in the light most favorable to Officer Long—we must conclude that Ms. Beasley knew or at least exhibited reckless disregard for the truth of the portion of her Facebook post indicating that Officer Long had harassed B.B.

Regarding inaccuracies in allegedly defamatory statements, this Court has held that for a statement to be found defamatory, "the <u>damaging</u> words must be factually false.  If the words are true, or essentially true, they are not actionable even though the statement contains other inaccuracies which are not damaging."  *See Revis v. McClean*, 31 S.W.3d 250, 253 (Tenn. Ct. App. 2000) (quoting *Stones River Motors, Inc. v. Mid-South Publ'g*

*Co., Inc.*, 651 S.W.2d 713, 719 (Tenn. Ct. App. 1983) (abrogated on other grounds)) (emphasis added). In other words, the "defense of truth applies so long as the 'sting' (or injurious part) of the statement is true." *See Stones River Motors*, 651 S.W.2d at 719. This Court has also determined that certain factual discrepancies in alleged defamatory statements are "immaterial" when "a statement of the truth would not have a different effect on the reader or viewer." *See SmileDirectClub*, 2024 WL 423949, at *12 (citations omitted).

Upon reviewing Ms. Beasley's Facebook post stating, "now here he is harassing [P.B. and B.B.] and searching vehicles claiming to smell weed each time," we determine that the potentially defaming "sting" of the statement lies not with which of her sons had encountered Officer Long but rather with Ms. Beasley's assertion that Officer Long had been "harassing" them by "searching vehicles" and "claiming to smell weed each time." Therefore, despite the inaccuracy contained within Ms. Beasley's Facebook post and her conflicting testimony regarding Officer Long's potential encounters with her son, B.B., we determine the evidence regarding the discrepancy to be "incapable of proving *material* falsity." *See id.* at *14. We find the question of whether Officer Long "harassed" P.B. through multiple traffic stops, or whether he harassed both P.B. and B.B through multiple traffic stops, to be immaterial to the question of what effect Ms. Beasley's post would have on the reader. *See id.* at *12. In other words, we conclude that the reader would not be mindful of which son had encountered Officer Long but instead would be concerned with Officer Long's alleged harassing behavior. Thus, although Ms. Beasley misspoke regarding Officer Long's purported encounter with B.B., the discrepancy does not, without more, rise to the level of actual malice. Therefore, even reviewing the evidence in the light most favorable to Officer Long, we determine that Officer Long failed to present clear and convincing evidence that Ms. Beasley made the statement with actual malice.

Furthermore, concerning Officer Long's alleged encounter with B.B., it appears that Ms. Beasley may have been genuinely confused regarding which officer had pulled over B.B. She testified that B.B. had been stopped around the same time as P.B. had been pulled over by Officer Long. However, when asked directly if B.B. had been pulled over by Officer Long, she responded, "I don't believe so." Ms. Beasley then explained that the traffic stops had happened "back-to-back" "within a few weeks of each other." For these reasons, Officer Long has not established, by clear and convincing evidence, that Ms. Beasley made the above statement with knowledge of its falsity or reckless disregard for the truth.

The same analysis applies to the final alleged defamatory statement posted by Ms. Beasley on Mr. Upchurch's Facebook page:

He broke panels and all kinds of s*** in [B.B.'s] Tahoe.

As with her other statements, the parties agree that Ms. Beasley posted this statement about Officer Long, satisfying the first element of a *prima facie* case for defamation against her. Officer Long urges that the remaining elements are also met because the statement was "incorrect regarding: i) the vehicle, ii) the subject of the investigation, and iii) the investigating officer." Officer Long posits that a statement "with this many factual errors" could lead a reasonable jury to conclude that Ms. Beasley possessed a "high degree of awareness of their probable falsity, if not outright knowledge of the falsity of her statements."

Ms. Beasley admits in her appellate brief that the statement she posted is inaccurate regarding the detail of which son and which vehicle she believed Officer Long had damaged. She repeatedly acknowledged during her deposition that she "misspoke" when writing this statement because she meant to refer to P.B.'s Escalade, rather than B.B.'s Tahoe. Ms. Beasley further clarified during her deposition that the confusion relative to the two vehicles occurred in part because B.B.'s Tahoe had also been damaged by an Ashland City police officer, albeit not by Officer Long. Regarding the incident between Officer Long and P.B. during which the Escalade was purportedly damaged, Ms. Beasley testified as follows:

| Attorney: | [After reading the full Facebook post to Ms. Beasley on the record] Is that an accurate statement? |
|---|---|
| Ms. Beasley: | No, sir, it's not because that—the one that—the stuff that got broken in [B.B.'s] vehicle was actually another Ashland City police officer. It was [P.B.'s] Escalade that got searched and pried at and poked at and broken. |

\* \* \*

| Attorney: | So the time that your son, [P.B.] was charged with possession, was that the time that you claimed that the panels and all kinds of other stuff was broken in his Tahoe? |
|---|---|
| Ms. Beasley: | Well, [P.B.] has an Escalade, a Cadillac Escalade. [B.B.] had a Tahoe and— |
| Attorney: | So your statement said [B.B.'s] Tahoe, but that's what you're saying these— |
| Ms. Beasley: | Well, [P.B.]—[B.B.'s] panels were broken on his. It wasn't by [Officer Long]. It was by another Ashland City officer. |

- 30 -

Attorney:          Who was that officer?

Ms. Beasley:       I don't know his name, sir.  It was two officers.  They
                   pulled him over in the Food Lion parking lot, leaving
                   Ryan Upchurch's house.

Attorney:          Your son, [B.B.]?

Ms. Beasley:       Yes, sir.  And tore through his vehicle, searched it.  You
                   know, found nothing.  But they still went through it,
                   they went through his cell phone, they went through all
                   of it, they went—counted his money.

Attorney:          Those were two other Ashland City officers other than
                   Mr. Long?

Ms. Beasley:       Yes, sir.  That's what I said.  I misspoke on this one right
                   here.  I should have said [P.B.'s] Escalade.

* * *

Attorney:          Okay.  So, tell me about [P.B.'s] stop.

Ms. Beasley:       Well, [P.B.] got pulled over initially for the lightbulb
                   being out over his license plate . . . .  [Officer Long]
                   went through [P.B.'s] Escalade.  Pulled out his
                   pocketknife, and started prying at the woodwork on his
                   dash, even like trying to, like, pick his dash open.  And
                   he climbs through the back, and you can hear crunching
                   on the video of the—of the plastic breaking, and then
                   he—he tries to climb underneath his Escalade, then he
                   pops the hood on his vehicle, and accuses him of having
                   a possible hidden compartment underneath the engine,
                   and that's from his experience of people that traffic
                   drugs.  So basically, implying that my—my kids are
                   trafficking drugs.  So, yes.  I call that bulls***, and I
                   call that being harassed.

    As Officer Long correctly avers, and as discussed above, Ms. Beasley admitted that
it was not B.B.'s Tahoe, as she had inaccurately posted on Mr. Upchurch's Facebook page,
but rather it was P.B.'s Escalade that she believed had been damaged by Officer Long.
Thus, taking the deposition testimony in the light most favorable to Officer Long, we

- 31 -

conclude that Ms. Beasley posted her comment about the wrong son and the wrong vehicle at least with reckless disregard for the truth of those details.

However, as with the above-reviewed discrepancy regarding whether Officer Long had conducted a traffic stop or interacted with B.B., we determine that although Ms. Beasley posted the statement including the wrong son's name and the wrong type of vehicle, the statement was not defamatory because the statement's effect on the reader would have remained the same had she correctly posted that it was P.B.'s Escalade, not B.B.'s Tahoe, that Officer Long had damaged. *See SmileDirectClub*, 2024 WL 423949, at *12. This is because the potentially damaging words in the post were not in the details of which son, or which vehicle, was damaged, but in Ms. Beasley's assertion that Officer Long "harassed" one of her sons by "breaking panels" and other items in his vehicle. *See Revis*, 31 S.W.3d at 253. Ms. Beasley articulated in her deposition that she believed that Officer Long's behavior in damaging P.B.'s vehicle was an instance of harassment. Thus, the "sting" of Ms. Beasley's statement (that Officer Long "harassed" her son and "broke" parts of his vehicle) remained true. *See Stones River Motors*, 651 S.W.2d at 719. We therefore determine Ms. Beasley's misstatement regarding which son and which vehicle to be immaterial to the question of whether the posted statement was defamatory.

Upon our *de novo* review, we determine that the record contains no evidence indicating that Ms. Beasley did not believe that Officer Long had damaged her son's vehicle. Accordingly, Officer Long has not presented sufficient proof in the record to establish, by clear and convincing evidence, that Ms. Beasley made the statement with actual malice relative to the alleged defamatory portions of the statement.

We conclude that Officer Long failed to establish a *prima facie* case of defamation against either Mr. or Ms. Beasley and that the trial court should have granted the Beasleys' TPPA petition and dismissed the case.

## VI. Attorney's Fees

The Beasleys argue that the trial court should have dismissed the case and awarded them "attorney's fees and costs" pursuant to § 20-17-107 of the TPPA. The section provides in pertinent part:

(a)     If the court dismisses a legal action pursuant to a petition filed under this chapter, the court shall award to the petitioning party:

(1)     Court costs, reasonable attorney's fees, discretionary costs, and other expenses incurred in filing and prevailing upon the petition[.]

The plain language of the statute indicates that an award of costs and attorney's fees upon

dismissal under the TPPA is mandatory. *See Bellamy v. Cracker Barrel Old Country Store, Inc.*, 302 S.W.3d 278, 281 (Tenn. 2009) ("When 'shall' is used in a statute or rule, the requirement is mandatory.") (citing *Stubbs v. State*, 393 S.W.2d 150, 154 (Tenn. 1965)); *see also Nandigam*, 639 S.W.3d at 660 ("If the court dismisses a legal action pursuant to a TPPA petition, the petitioning party shall be awarded 'court costs, reasonable attorney's fees, discretionary costs, and other expenses incurred in filing and prevailing upon the petition[.]'") (quoting Tenn. Code Ann. § 20-17-107(a)). Because we hold that this defamation action should have been dismissed by the trial court pursuant to the TPPA, we find the request for attorney's fees and costs to be well taken. We therefore remand this matter to the trial court for a determination of the proper amount of reasonable attorney's fees and costs incurred by the Beasleys during the underlying lawsuit and for an award of such amount.

## VII.  Conclusion

For the foregoing reasons, the trial court's October 21, 2024 order granting Officer Long's voluntary nonsuit is vacated, and Officer Long's pending motion to dismiss this appeal as moot is denied. In addition, the trial court's February 29, 2024 order denying the Beasleys' petition for dismissal pursuant to the TPPA is reversed, and the defamation lawsuit against Mr. and Ms. Beasley is dismissed. The case is remanded to the trial court for a determination of reasonable attorney's fees and costs to be awarded to the Beasleys pursuant to § 20-17-107 of the TPPA. Costs on appeal are assessed to the appellee, Officer Jeremy Wayne Long.

s/Thomas R. Frierson, II

_____

THOMAS R. FRIERSON, II, JUDGE